## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHANEENA S. HOLLAND-CARTER, | |
| Plaintiff, | |
| v. | Civil Action No.: 2:22-cv-03542 |
| UPMC HEALTH PLAN, INC, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

By:    *s/ Thomas K. Johnson*
Thomas K. Johnson II (I.D. No. 84363)
Thomas.Johnson@faegredrinker.com
Brooke Razor (I.D. No. 322539)
Brooke.Razor@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700

*Attorneys for Defendant*

Dated: March 29, 2024

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................ 2

    A.   About UPMC Health Plan. ..................................................................... 2

    B.   Plaintiff's Role as a CHC Service Coordinator. ..................................... 2

    C.   Plaintiff Begins Reporting to Olga Dember, Who Identifies Concerns with Plaintiff's Performance. ..................................................................... 3

    D.   Ms. Dember and Mr. Mendez Report Concerns About Plaintiff's Performance to Human Resources. ......................................................... 4

    E.   An Objective Audit of Plaintiff's Caseload Reveals Significant Performance Issues and Plaintiff Becomes Increasingly Disrespectful Toward Ms. Dember. ............................................................................. 4

    F.   Plaintiff's Suspension and Termination. .................................................. 7

    G.   Plaintiff's Post-Audit Complaint About Her Caseload ........................... 8

    H.   Plaintiff's Post-Suspension Help Line Report. ....................................... 9

    I.   After Her Separation from the Health Plan, Plaintiff Removed Herself from the Workforce and Then Began Fully Mitigating Her Alleged Damages. .............................................................................................. 10

    J.   Plaintiff Admits She Has No Evidence that the Health Plan Discriminated Against Her But Brings a Claim for Race Discrimination Anyway. ................... 10

III. SUMMARY JUDGMENT STANDARD ....................................................... 11

IV.  ARGUMENT ............................................................................................... 12

    A.   Plaintiff's Section 1981 Race Discrimination Claim Fails as a Matter of Law Because Plaintiff Cannot Prove a *Prima Facie* Case of Discrimination or that the Health Plan's Actions Were Pretextual. ...................... 12

        1.   Plaintiff Cannot Establish a Prima Facie Case of Discrimination because She Cannot Identify Any Similar Situated Individuals Outside Her Protected Class Who Were Treated More Favorably Than Her or That Her Termination Occurred Under Other Circumstances Giving Rise to an Inference of Discrimination. ................ 14

        2.   The Health Plan Had a Legitimate, Non-Discriminatory Reason for Its Actions. ....................................................................................... 16

        3.   Plaintiff Cannot Establish that the Health Plan's Legitimate Reason for Terminating Her is Pretext for Discrimination. ...................................... 16

    B.   Plaintiff Does Not Come Close to Establishing the Existence of a Racially Hostile Work Environment in Violation of Section 1981 ....................... 19

i

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  |  |
|---|---|---|
| 1. | Plaintiff Does Not Allege Severe or Pervasive Conduct. | 20 |
| 2. | Plaintiff Has No Evidence That the Conduct She Alleges was Because of Her Race. | 22 |
| C. | Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Wage Loss Damages. | 23 |
| V. | CONCLUSION | 25 |

## **TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

Anderson v. Consol. Rail. Corp.,
    2000 WL 1622863 (E.D. Pa. Oct. 25, 2000) ............................................................... 25

Anderson v. Haverford College,
    868 F. Supp. 741 (E.D. Pa. 1994) .............................................................................. 14

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) .................................................................................................. 12

Bangura v. Pennsylvania,
    793 F. App'x 142 (3d Cir. 2019) .............................................................................. 16

Billet v. CIGNA Corp.,
    940 F.2d 812 (3d Cir. 1991) ..................................................................................... 18

Blum v. Witco Chem. Corp.,
    829 F.2d 367 (3d. Cir. 1987) .................................................................................... 25

Boandl v. Geithner,
    752 F. Supp. 2d 540 (E.D. Pa. 2010) .......................................................... 20, 21, 22

Bossalina v. Lever Bros. Co.,
    1986 WL 9814 (M.D. Pa. June 11, 1986) ................................................................ 23

Briggs v. Temple Univ.,
    339 F. Supp. 3d 466 (E.D. Pa. 2018) ...................................................................... 23

Caufield v. Ctr. Area Sch. Dist.,
    133 F. Appx. 4 (3d Cir. 2005) .................................................................................. 23

Caufield v. Ctr. Area Sch. Dist.,
    133 Fed. Appx. 4 (3d Cir. 2005) .............................................................................. 23

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ............................................................................................ 11, 12

Chandler v. La-Z-Boy, Inc.,
    621 F. Supp. 3d 568 (E.D. Pa. 2022) .................................................................. 19, 21

Chauhan v. M. Alfieri Co., Inc.,
    897 F.2d 123 (3d Cir. 1990) ..................................................................................... 16

Chiaradonna v. Rosemont Coll.,
    2008 WL 282253 (E.D. Pa. Jan. 31, 2008) ............................................................. 18

Collins v. Kimberly-Clark Pennsylvania, LLC,
    247 F. Supp. 3d 571 (E.D. Pa. 2017) ............................................................ 12, 13, 14

Davis v. Solid Waste Servs., Inc.,
    20 F. Supp. 3d 519 (E.D. Pa. 2014)........................................................................ 21

Deans v. Kennedy House, Inc.,
    998 F. Supp. 2d 393 (E.D. Pa. 2014) ............................................................ 19, 20, 22

Dill v. Runyon,
    1997 WL 164275 (E.D. Pa., Apr. 3, 1997) ............................................................. 14

Doe v. Apria Healthcare Group Inc.,
    97 F. Supp. 3d 638 (E.D. Pa. 2015)................................................................... 16, 17

Doe v. Triangle Doughnuts, LLC,
    472 F. Supp. 3d 115 (E.D. Pa. 2020) ..................................................................... 22

EEOC v. Unitek, USA, LLC,
    2010 WL 1626617 (E.D. Pa. Apr. 19, 2010)........................................................ 25

Felder v. Penn Manuf'g Industries, Inc.,
    182 F. Supp. 3d 203 (E.D. Pa. 2016) ................................................................ 20, 22

Frankhouser v. Fed.-Mogul Corp.,
    1999 WL 110624 (E.D. Pa. Jan. 11, 1999)............................................................ 23

Fuentes v. Perskie,
    32 F.3d 759 (3d Cir. 1994)....................................................................................... 17

Gen. Bldg. Contractors Ass'n v. Pennsylvania,
    458 U.S. 375 (1982) ................................................................................................. 13

Gilbert v. Philadelphia Media Holdings LLC,
    564 F. Supp. 2d 429 (E.D. Pa. 2008) ............................................................... 13, 18

Hampshire v. Bard,
    793 Fed. Appx. 75 (3d Cir. 2019) .......................................................................... 14

Holocheck v. Luzerne Cnty. Head Start, Inc.,
    2007 WL 954308 (M.D. Pa. Mar. 28, 2007) ......................................................... 24

Jarmon v. Trader Joe's Company,
    660 F. Supp. 3d 357 (E.D. Pa. 2023) ..................................................................... 14

Jones v. Sch. Dist. of Phila.,
    198 F.3d 403 (3d Cir. 1999) ............................................................................... 17, 18

Kargbo v. Phila. Corp. for Aging,
    16 F. Supp. 3d 512 (E.D. Pa. 2014)........................................................................ 16

Keller v. Orix Credit Alliance, Inc.,
    130 F.3d 1101 (3d Cir. 1997) .............................................................................. 18

Lassiter v. Children's Hosp. of Phila.,
    131 F. Supp. 3d 331 (E.D. Pa. 2015) .................................................................. 18

Lin v. Rohm and Haas Co.,
    293 F. Supp. 2d 505 (E.D. Pa. 2003) ..............................................................14, 15

Mandel v. M & Q Packaging Corp.,
    706 F. 3d 157 (3d Cir. 2013) .............................................................................. 19

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973).........................................................................................12, 16

McKenna v. City of Phila.,
    636 F. Supp. 2d 446 (E.D. Pa. 2009) ................................................................ 23

McLintock v. City of Philadelphia,
    504 F. Supp. 3d 411 (E.D. Pa. 2020) ................................................................ 17

Miller v. Thomas Jefferson Univ. Hosp.,
    908 F. Supp. 2d 639 (E.D. Pa. 2012) ................................................................ 20

Moss v. Nat'l Railroad Passengers Corp.,
    2019 WL 4697603 (E.D. Pa. Sep. 26, 2019) ...................................................... 18

Ngai v. Urban Outfitters, Inc.,
    2021 WL 1175155 (E.D. Pa. Mar. 29, 2021) ..................................................... 23

Ocasio v. Lehigh Valley Family Health Cr.,
    92 Fed. Appx. 876 (3d Cir. 2004) ...................................................................... 22

Ocasio v. Lehigh Valley Family Health Ctr.,
    368 F. Supp. 2d 370 (E.D. Pa. 2003) ................................................................ 21

Onely v. Redner's Markets, Inc.,
    2023 WL 6626120 (E.D. Pa. Oct. 11, 2023) ...................................................12, 13

Perkins v. Bringham & Woman's Hosp.,
    78 F.3d 747 (1st Cir. 1996).................................................................................. 14

Pollard v. Wawa Food Market,
    366 F. Supp. 2d 247 (E.D. Pa. 2005) ................................................................ 13

v

Red v. Potter,
    211 F. App'x 82 (3d Cir. 2006) ................................................................................ 14

Ruff v. Temple Univ.,
    122 F. Supp. 3d 212 (E.D. Pa. 2015) ................................................................ 18, 19

Sanchez v. SunGard Availability Servs. LP,
    362 Fed. Appx. 283 (3d Cir. 2010) ........................................................................ 20

Shaw v. Temple Univ.,
    357 F. Supp. 3d 461 (E.D. Pa. 2019) ..................................................................... 21

Sunshine Books, Ltd. v. Temple Univ.,
    697 F.2d 90 (3d Cir. 1982) ..................................................................................... 12

Texas Dep't of Community Affairs v. Burdine,
    450 U.S. 248 (1981) ................................................................................................ 14

Tran v. Delavau LLC,
    615 F. Supp. 2d 381 (E.D. Pa. 2009) ..................................................................... 14

Tubari Ltd., Inc. v. N.L.R.B.,
    959 F.2d 454 (3d Cir. 1992) ................................................................................... 23

Vladimirsky v. Sch. Dist. of Phila.,
    144 A.3d 986 (Commw. 2016) ............................................................................... 23

Williams v. Greyhound Lines Inc.,
    1998 WL 551981 (E.D. Pa. Aug. 11, 1998) .......................................................... 13

Woodward v. PHB Die Casting,
    255 Fed. Appx. 608 (3d Cir. 2007) ........................................................................ 20

Youssef v. Anvil Intern.,
    595 F. Supp. 2d 547 (E.D. Pa. 2009) ..................................................................... 21

Ziegler v. Del. Cty. Daily Times,
    128 F. Supp. 2d 790 (E.D. Pa. 2001) ..................................................................... 18

**Statutes, Rules & Regulations**

42 U.S.C. § 1981 ............................................................................................... *passim*

Rule 56 of the Federal Rules of Civil Procedure ..................................................... 11

## I.   INTRODUCTION

UPMC Health Plan, Inc. (the "Health Plan"), a nonprofit health plan, terminated Plaintiff's employment as a Community Health Choices Service Coordinator in 2022 after a thorough audit of her assigned caseload revealed the Plaintiff's gross misconduct. Plaintiff's misconduct included not reporting allegations of neglect and exploitation to Adult Protective Services, disclosing sensitive information to a third party without authorization, and failing to complete documentation including updating care plans. Ensuring that her assigned participants received the necessary services and documenting what was happening with each case was at the core of Plaintiff's job and her failure to do her job as directed by the Health Plan created serious risks that the Health Plan could not tolerate. Terminating Plaintiff's employment was appropriate and necessary.

Unwilling to accept the reality of her own repeated failings and the consequences of the same, after the decision to terminate was made, Plaintiff concocted a race discrimination claim. However, there is no evidence to support such a claim. Indeed, even Plaintiff candidly admits that she "does not know why [the Health Plan] treated [her] differently" and does not know why her supervisor or anyone else acted the way that they did. Further, when pressed, Plaintiff could not identify any Service Coordinator outside of her protected class who engaged in similar misconduct and was treated better than she was. Instead, Plaintiff relies on general allegations that her immediate manager, Ms. Dember, was "rude" to her, critical of her work, and scheduled meetings that were, in Plaintiff's view, too frequent or too long. But, Ms. Dember did not make the decision to terminate Plaintiff's employment and, even if she did, Plaintiff's disagreement about management style does not constitute evidence of race discrimination.

Based on the undisputed evidence, there is no genuine issue of material fact in dispute and, consequently, the Court should grant Defendant's summary judgment motion.

## II.     FACTUAL BACKGROUND[1]

### A.     <u>About UPMC Health Plan.</u>

UPMC Health Plan is a non-profit health plan owned by the University of Pittsburgh Medical Center, a domestic non-profit corporation headquartered in Pittsburgh, Pennsylvania. It delivers high quality care to its participants, including through a Medicaid program, Community Health Choices, that allows managed care organizations—like the Health Plan—to coordinate medical care and long-term services and supports for qualified individuals. The Health Plan employs CHC Service Coordinators throughout various regions in Pennsylvania to facilitate the provision of these services to its participants, who are sometimes also referred to as members. The Health Plan is an equal opportunity employer and prohibits discrimination and harassment in the workplace on the basis of any protected characteristic, including race.

### B.     <u>Plaintiff's Role as a CHC Service Coordinator.</u>

Plaintiff Shaneena Holland-Carter (African American) began working full time for the Health Plan as a CHC Service Coordinator in its Southeastern Pennsylvania region in April 2019. In that role, Plaintiff was responsible for coordinating healthcare as well as home- and community-based services for her assigned participants. Plaintiff worked with people who "need assistance from others to complete activities," usually due to sickness, disability, or some other limitation. Her job, in a nutshell, was to "ensure that [participants] are receiving the services they need," by conducting assessments, maintaining communication with appropriate parties, and keeping track of participants' care. A key aspect of her role was leading the Person-Centered Service Planning ("PCSP") process. This required her to enter key data for her assigned cases into the electronic system, Helios. Plaintiff was never employed as a supervisor and did not have responsibility for

---

[1] Defendant incorporates by reference its Statement of Undisputed Material Facts submitted herewith, which includes detailed citations to the record.

or involvement with disciplining other employees. She likewise did not work in Human Resources ("HR") and did not have access to other employees' disciplinary or HR records.

### C.   Plaintiff Begins Reporting to Olga Dember, Who Identifies Concerns with Plaintiff's Performance.

In approximately August 2021, Olga Dember, Service Coordinator Supervisor (Caucasian), began supervising Plaintiff. Shortly thereafter, Ms. Dember identified concerns with Plaintiff's work performance. For example, Ms. Dember often had to follow up with Plaintiff to join scheduled meetings, mark herself available in Microsoft Teams, correctly enter her time, and accurately complete tasks. Ms. Dember tried to help Plaintiff when she expressed feeling overwhelmed and tried to be accommodating to Plaintiff wherever possible.

During a supervision meeting Ms. Dember held with Plaintiff on October 19, 2021, Ms. Dember and Plaintiff discussed what Ms. Dember considered to be several "concerning cases/participant issues," including overdue tasks and expired authorizations. Plaintiff recalled telling Ms. Dember during their discussion that she had done the work but not entered certain required data into the system to reflect that.

The day after their meeting, and unbeknownst to Ms. Dember, Plaintiff requested a leave of absence through the Health Plan's outside provider that administers leave, which was granted. Her leave lasted from October 20 to December 6, 2021. During Plaintiff's leave, Ms. Dember reassigned Plaintiff's caseload to other service coordinators on her team. While Plaintiff was away from work, Ms. Dember learned about additional performance concerns, including a report from a participant of unprofessional conduct by Plaintiff and other significant issues.

After Plaintiff returned in December 2021, Ms. Dember held a supervision meeting in which she discussed issues with Plaintiff that, in Ms. Dember's view as Plaintiff's supervisor, Plaintiff needed to immediately address, including making sure that Plaintiff was completing

assessments and addressing tasks in a timely manner, attending scheduled meetings, reporting participant switch requests, and other issues.  Ms. Dember had identified and discussed these concerns prior to Plaintiff taking leave and felt it was important to address them with Plaintiff during their first meeting upon Plaintiff's return.

**D.**     **Ms. Dember and Mr. Mendez Report Concerns About Plaintiff's Performance to Human Resources.**

In late December 2021 or early January 2022, Ms. Dember and her supervisor, Long Term Supportive Services Manager Renaldo Mendez (Hispanic/Latino), contacted Human Resources Consultant Jacquelynne Bisch (Caucasian) to discuss their concerns about Plaintiff's performance. They told Ms. Bisch about the concerns noted above, which Ms. Dember had already been discussing with Plaintiff, as well as third-party complaints that had been made about Plaintiff while she was on leave, including an allegation that Plaintiff had accepted a bribe from a participant.

In response, Ms. Bisch directed Ms. Dember and Mr. Mendez to conduct an audit of Plaintiff's cases to review whether applicable policies and procedures were being followed and identify any potential issues.  This was the Health Plan's practice if, as in this case, a manager had concerns about participant safety or related issues.  The purpose of the audit was to ensure that Plaintiff was compliant with applicable regulations and practices.  Ms. Bisch also consulted with Heather Pope, Senior Compliance Manager (Caucasian), who was responsible for reviewing audits from a compliance perspective, while Ms. Bisch focused on the human resources perspective.

**E.**     **An Objective Audit of Plaintiff's Caseload Reveals Significant Performance Issues and Plaintiff Becomes Increasingly Disrespectful Toward Ms. Dember.**

On January 14, 2022, per Ms. Bisch's request, Ms. Dember conducted an audit of ten (10) of Plaintiff's cases.  Ms. Dember selected the cases randomly from those that had been assigned to Plaintiff before she took leave in October 2021.  In the audit, Ms. Dember was looking in the electronic system, Helios, to see if certain tasks and documentation had been completed for

Plaintiff's cases; for example, the last documented interaction Plaintiff had with each participant, whether any tasks were marked "overdue" for that case, and when the last monthly call to the participant was held.  Ms. Dember did not disclose the audit to Plaintiff, who was not aware that the audit was being conducted and had no knowledge about the audit process generally.

In January 2022, Plaintiff was becoming increasingly antagonistic toward Ms. Dember. For example, although Plaintiff understood that it was her obligation to tell her supervisor when she was not working, Ms. Dember had to repeatedly remind Plaintiff—a non-exempt, hourly employee—to ensure that her time was correctly recorded.  On one such occasion, when Ms. Dember discovered that Plaintiff was not working and reminded her that she needed to notify someone if she had to be off during her regular hours, Plaintiff became disrespectful toward Ms. Dember and intimated that she should back off.  A few days later, Plaintiff apologized for her behavior and said she did not want Ms. Dember to feel like she was "attacking" Ms. Dember.  On another occasion, Plaintiff sent Ms. Dember an aggressive email, accusing Ms. Dember of not having informed Plaintiff about a participant transfer (even though Ms. Dember had very clearly done so further down in the email thread) and telling Ms. Dember, sarcastically, that "that makes a lot of sense."  On February 7, 2022, in an effort to remedy the issues with Plaintiff's performance and her disrespect toward Ms. Dember, Mr. Mendez attended the beginning of a supervision meeting between Plaintiff and Ms. Dember.  The meeting continued on February 8.  During the follow-up meeting, Plaintiff became defensive in response to Ms. Dember's feedback and said to Ms. Dember, "I refute all demonic oppressive supervisory influence."  Ms. Dember reported this comment to Mr. Mendez immediately after it happened.  Mr. Mendez recalled that Ms. Dember came to him in tears and that she was "distraught" about the situation.  Ms. Dember, who is Jewish,

believed this statement was anti-Semitic because "it is a common trope to call Jews satan or demon." At her deposition, Plaintiff said that she "[did] not recall" making the comment.

The audit into Plaintiff's caseload continued, and Ms. Dember found multiple issues with the cases she reviewed, including missing documentation, incomplete tasks, and care plans that had not been updated. After Ms. Dember conducted the initial audit, Ms. Bisch requested that Audrey Moore, Senior Telephonic Case Manager (African American), conduct an audit of additional cases from Plaintiff's caseload. Ms. Moore has been a nurse since 1982, was trained in how to conduct audits, and had conducted audits for members of Mr. Mendez's team before. She became involved in the audit to ensure that HR and Compliance understood the "bigger picture" of Plaintiff's caseload given that she had recently been away from work, because HR wanted to make a fair determination as to what was going on with Plaintiff's cases.

On January 26, 2022, Ms. Moore—who had never met or interacted with Plaintiff—completed an audit of ten (10) additional cases from Plaintiff's caseload. Like Ms. Dember's audits, Ms. Moore found outdated care plans, care plans with missing information, missing authorizations, and participants who did not have monthly outreach calls, among other issues. Almost simultaneously with Ms. Moore's audits, Ms. Dember also uncovered an additional issue with another participant, for whom a report of possible neglect and exploitation had been made, which Plaintiff failed to report to Adult Protective Services ("APS"). Ms. Dember also found that Plaintiff recorded an assessment in the system, but the participant's daughter and a provider reported that no such assessment had occurred and that the last time Plaintiff saw the participant was three months before the assessment date that Plaintiff had put in the system.

Ms. Moore then completed an audit of an additional five (5) cases, bringing the total number of Plaintiff's cases that had been audited to twenty-six (26). Ms. Moore again found that

care plans had expired and were missing information, inconsistent or lacked documentation regarding participant contact, and other issues with the cases she reviewed.  In addition to auditing specific cases, Ms. Pope requested that Mr. Mendez pull Plaintiff's outstanding person-centered service plan (also referred to as "PCSP") and task lists for review, in order to show any tasks that may have been overdue on Plaintiff's cases.  Records showed that Plaintiff had at least sixty (60) outstanding tasks, fifty (50) of which were past due and many of which were urgent in nature.

**F.**     **Plaintiff's Suspension and Termination.**

Ms. Bisch and Ms. Pope analyzed the audit results as they received them.  In Ms. Bisch's opinion, the audits—which showed numerous instances of lack of contact with participants, failure to report participant concerns and follow up on critical incidents, and failure to complete documentation—were "very concerning."

As a result of the findings from the audits, Ms. Bisch decided to suspend Plaintiff's employment.  On February 14, 2022, Ms. Bisch and Ms. Pope met with Plaintiff to review the audit results and inform her of the suspension.  Plaintiff disputed some of what the audits had found but did not dispute that she had failed to complete certain documentation, make the APS report, and comply with certain HIPAA requirements.

After they interviewed Plaintiff, Ms. Bisch and Ms. Pope met with Mr. Mendez on the same day to review what Plaintiff had told them.  Based on the conversation with Mr. Mendez, during which he shared records relating to what Plaintiff had said during her interview, Ms. Bisch came to believe that several statements Plaintiff made during her interview were false.  For example, Plaintiff said that she was working with a case manager on one participant file, but the records did not support that claim.  Likewise, Plaintiff said that there were notes saved in draft form on certain cases, but when Mr. Mendez reviewed the records, there were no such notes. Plaintiff also said things that Ms. Bisch knew to be untrue based on her experience as an HR

7

Consultant. Specifically, Plaintiff had said that she was unaware of HIPAA requirements even though she had received multiple trainings on such requirements. Plaintiff's alleged lack of knowledge of HIPAA is incredible, given both the Health Plan's training requirements on HIPAA and that she herself has previously sued a healthcare institution for violating her privacy.

After interviewing Plaintiff and speaking to Mr. Mendez on February 14, Ms. Bisch made the decision to terminate Plaintiff's employment on the same day. Ms. Bisch informed Ms. Pope of the termination decision sometime between February 14 and 18. She also consulted with Mr. Mendez about the decision, who agreed with the decision due to Plaintiff's conduct and the vulnerability of the population with which she was expected to work. Ms. Dember was not involved in either the suspension or termination decisions. Due to the time it took to process the termination paperwork, Plaintiff was formally terminated on March 9, 2022.

### G.   Plaintiff's Post-Audit Complaint About Her Caseload

At some point in late January or early February 2022, after the audit of her caseload was already underway (albeit unbeknownst to Plaintiff), Plaintiff called Ms. Bisch to complain about the assignment of her caseload. During the call, Plaintiff told Ms. Bisch that she had moved from Philadelphia to Delaware County and wanted to be reassigned to cases closer to her new home.

Cases are assigned based on availability, location (typically within a 50-mile radius of the service coordinator's home), and whether the participant has any particular needs.[2] Case assignments are generally handled by a service coordinator's supervisor—in this case, Ms. Dember. When Plaintiff requested that her cases be reassigned due to her personal move, Ms. Dember explained that it would not be possible to completely reassign Plaintiff's caseload for operational reasons; namely, because everyone else on the team had a full caseload already.

---

[2] Plaintiff had no knowledge of this process and admitted that she was never involved in handling case assignments.

During their conversation, Ms. Bisch told Plaintiff that the assignment of cases is an operational issue, which Plaintiff should discuss with Ms. Dember. According to Plaintiff, during her conversation with Ms. Bisch, she told Ms. Bisch that Ms. Dember had been treating her unfairly. Plaintiff does not recall any details of the conversation, other than that she told Ms. Bisch about "excessively long meetings," multiple supervision sessions within a week, and alleged "lack of follow up" on "supervisor tasks." She also claimed that Ms. Dember was "rude and disrespectful" and "undermine[d] [her] work and capabilities." At no point during the conversation did Plaintiff make a claim of race discrimination. Plaintiff does not recall Ms. Bisch's response with any level of detail but remembers feeling "unsupported."

By the time the conversation happened, the audit of Plaintiff's cases was already underway and significant concerns had been identified with her performance. Ms. Bisch told Plaintiff that if she had any other concerns, she should email them to Ms. Bisch so that Ms. Bisch could address them. Plaintiff did not email Ms. Bisch and did not do anything to follow up on their conversation.

### H.    Plaintiff's Post-Suspension Help Line Report.

On February 15, 2022, after she was suspended, Plaintiff contacted the Health Plan's third-party Help Line for the first time. In her report, Plaintiff alleged that Ms. Dember was retaliating against her because, according to Plaintiff, she had requested that Mr. Mendez attend their supervision meeting on February 7, 2022. Plaintiff did not mention alleged race discrimination in her Help Line call. She also did not mention her conversation with Ms. Bisch from a few weeks earlier. On February 18, 2022, Plaintiff initiated a second call to the Help Line, following up on her first call. She did not report any new information during the second call.

Plaintiff's Help Line reports were investigated and determined to have no merit. Investigators reached this conclusion because the audit that ultimately led to Plaintiff's termination

had started well before Plaintiff's alleged request for Mr. Mendez to attend the supervision meeting on February 7, 2022, which was the basis of her retaliation claim.

**I.**    **<u>After Her Separation from the Health Plan, Plaintiff Removed Herself from the Workforce and Then Began Fully Mitigating Her Alleged Damages.</u>**

Plaintiff's job at the Health Plan was a full-time, non-exempt position earning $52,000 per year. Prior to her suspension, Plaintiff applied to a PhD program at Walden University, in which she then enrolled on a full-time basis from February 2022 through February 2023. When Plaintiff applied for unemployment compensation following her separation from the Health Plan, she swore under oath that she was no longer willing or able to work full time as she had at the Health Plan.

In March 2023, approximately one year after her separation and just a few weeks after she first applied to the job, Plaintiff accepted a Service Coordinator job with AmeriHealth Caritas/Keystone First, where she still works today. Plaintiff earns approximately $62,000 per year plus benefits in that role, which is more than she earned at the Health Plan.

**J.**    **<u>Plaintiff Admits She Has No Evidence that the Health Plan Discriminated Against Her But Brings a Claim for Race Discrimination Anyway.</u>**

When asked to name the people she believes discriminated against her, Plaintiff identified Ms. Dember, Ms. Bisch, and Patricia Ratwani (Mr. Mendez's supervisor).[3] When asked specifically, "Why do you believe you were treated differently because of your race," Plaintiff admitted, "I don't know why they treated me differently." <u>Ex. 6</u>, Pl. Dep. Tr. at 183:9-12.

Of Ms. Ratwani, Plaintiff said she "suspect[s]" that Ms. Ratwani was the "culprit" of the audits into her caseload. But Plaintiff could not recall anything Ms. Ratwani did or said to her and admitted that she does not know if Ms. Ratwani was actually involved in the audits. She only

---

[3] Plaintiff also initially named Ms. Pope, although she later said, "I don't think I have a specific complaint about her." Plaintiff did not identify any alleged discrimination by Mr. Mendez.

remembered that Ms. Ratwani asked her "personal questions" about a leave of absence that had been approved years earlier, in May of 2021.[4]

Of Ms. Bisch, Plaintiff alleges that she made Plaintiff feel "unsupported" when Plaintiff complained about the location of her case assignments, although she does not recall anything Ms. Bisch said to make her feel that way. Ex. 6, Pl. Dep. Tr. at 96:1-16.

Of Ms. Dember, Plaintiff admitted that she did not know why Ms. Dember in particular acted the way Plaintiff claims Ms. Dember acted toward her. Ex. 6, Pl. Dep. Tr. at 162:5-11 ("I don't know why she would target me."). Plaintiff admits that she was never present for Ms. Dember's supervision meetings with her colleagues and does not know how Ms. Dember spoke to them. She has never been a supervisor herself and had no access to her fellow employees' disciplinary or HR records. Plaintiff likewise could not identify any fellow CHC Service Coordinators who she believes were treated better or differently than her.

Despite these admissions, Plaintiff filed the current lawsuit on September 4, 2022, alleging a single count of race discrimination in violation of 42 U.S.C. § 1981. Plaintiff's claims have no merit and the Health Plan is entitled to summary judgment on the entirety of the Complaint.

### III.    SUMMARY JUDGMENT STANDARD

According to Rule 56 of the Federal Rules of Civil Procedure, the Court shall grant judgment "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). When the non-moving party bears the burden of persuasion at trial, the moving party may establish that summary judgment is appropriate by showing that the non-moving party's evidence is insufficient to carry that burden or that there is an absence of evidence to do so. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[4] Of course, Plaintiff's belief about Ms. Ratwani is unfounded. It is undisputed that Ms. Ratwani did not initiate the audit or make the decision to suspend or terminate Plaintiff's employment. See Def. Stmt. of Facts at n. 3.

The burden then shifts to the non-moving party to introduce evidence beyond the allegations in the complaint that creates a genuine issue of material fact. See Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982). For a factual dispute to be "genuine," the evidence presented must be such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). A court must enter summary judgment "against a [non-moving] party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex, 477 U.S. at 322.

## IV.   ARGUMENT

The Health Plan is entitled to summary judgment on the single claim Plaintiff brings against it pursuant to 42 U.S.C. § 1981 ("Section 1981"), including Plaintiff's claim for wage loss damages. Plaintiff alleges that the Health Plan discriminated against her by terminating her because of her race. Ex. 1, Complaint at ¶¶ 23, 28. She also claims that the Health Plan "create[ed] and perpetuat[ed] a racially hostile work environment," and that she is entitled to wage loss damages. Id. at ¶ 25. Defendant addresses each of Plaintiff's claims in turn below.[5]

### A.   **Plaintiff's Section 1981 Race Discrimination Claim Fails as a Matter of Law Because Plaintiff Cannot Prove a *Prima Facie* Case of Discrimination or that the Health Plan's Actions Were Pretextual.**

Discrimination claims brought under Section 1981 follow the familiar burden shifting framework first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), albeit with stricter standards of causation. See, e.g., Collins v. Kimberly-Clark Pennsylvania, LLC, 247 F. Supp. 3d 571, 588 (E.D. Pa. 2017); Onely v. Redner's Markets, Inc.,

---

[5] Plaintiff's Complaint indicates that her claim is based on "discrimination, harassment, and [the] creation and perpetuation of a racially hostile work environment." Ex. 1 at ¶¶ 23-25. She incorporates these into a single count under Section 1981 but given the different standards applicable to discrimination and hostile work environment claims, Defendant will analyze the claims separately.

No. 21-4785, 2023 WL 6626120, at *4-5 (E.D. Pa. Oct. 11, 2023) (Section 1981 imposes a more stringent "but for" causation standard). First, Plaintiff must make out a *prima facie* case of unlawful discrimination by showing that she is a member of a protected class and she was terminated or suffered some other adverse employment action. See, e.g., Williams v. Greyhound Lines Inc., C.A. No. 97-6997, 1998 WL 551981, at *3-4 (E.D. Pa. Aug. 11, 1998). She must also prove that she was qualified for the position and that similarly situated individuals outside of her protected class were treated more favorably, or that her termination occurred under other circumstances giving rise to an inference of discrimination. Id. at *4 (summary judgment granted on race discrimination claim where there was "simply no proof that similarly situated non-minority employees were treated more favorably"); Onely, 2023 WL 6626120 at *4-5.

If Plaintiff establishes a *prima facie* case, the burden of production shifts to the Health Plan to provide a legitimate, non-discriminatory reason for its actions. See, e.g., Gilbert v. Philadelphia Media Holdings LLC, 564 F. Supp. 2d 429, 434 (E.D. Pa. 2008) ("This is a 'relatively light' burden and…if met, the burden shifts back to the plaintiff who must demonstrate that the defendant's explanation is merely pretext."). After the Health Plan makes such a proffer, the burden shifts back to Plaintiff to prove that the Health Plan's proffered reason is actually pretext and that the "but for" cause of the Health Plan's decision was Plaintiff's race. Collins, 247 F. Supp. 3d at 604 ("…to prove causation at the pretext stage, the plaintiff must show that she would not have suffered the adverse action 'but for' her [race]."). This requires Plaintiff to prove that the Health Plan engaged in intentional discriminatory conduct. Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 382-91 (1982); see also Pollard v. Wawa Food Market, 366 F. Supp. 2d 247 (E.D. Pa. 2005).

1. ***Plaintiff Cannot Establish a Prima Facie Case of Discrimination because She Cannot Identify Any Similar Situated Individuals Outside Her Protected Class Who Were Treated More Favorably Than Her or That Her Termination Occurred Under Other Circumstances Giving Rise to an Inference of Discrimination.***

Plaintiff has no direct evidence of discrimination. Therefore, in order to survive summary judgment, Plaintiff must demonstrate that her termination occurred in circumstances that would give rise to an inference of discrimination. See, e.g., Collins, 247 F. Supp. 3d at 589; Jarmon v. Trader Joe's Company, 660 F. Supp. 3d 357 (E.D. Pa. 2023). This requires proving "that similarly situated persons [outside her protected class] were not treated equally." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981); Lin v. Rohm and Haas Co., 293 F. Supp. 2d 505, 517-18 (E.D. Pa. 2003) (employee failed to establish *prima facie* case under Section 1981). Two employees will be considered similarly situated for purposes of establishing a *prima facie* case if they are "similarly situated in all material respects." Dill v. Runyon, C.A. No. 96-3584, 1997 WL 164275, at *4 (E.D. Pa., Apr. 3, 1997) (citing Perkins v. Bringham & Woman's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)). Once Plaintiff has identified comparators, she must show that they engaged in acts of "'comparable seriousness' to [her] own infraction." Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994). If Plaintiff is unable to do this, and "[n]o reasonable jury could find that the comparators the plaintiff[] identified were similarly situated," or that there were other circumstances giving rise to discrimination, summary judgment is appropriate. Hampshire v. Bard, 793 Fed. Appx. 75, *80 (3d Cir. 2019) (summary judgment affirmed where plaintiffs produced no evidence of similarly situated employees treated more favorably than them); Tran v. Delavau LLC, 615 F. Supp. 2d 381, 388-89 (E.D. Pa. 2009); Red v. Potter, 211 F. App'x 82, 84 (3d Cir. 2006).

In this case, because Plaintiff has no direct evidence of discrimination, she must point to a comparator who was treated better than she was or some other evidence that suggests she was

terminated in circumstances giving rise to an inference of discrimination.  But she cannot do so. When asked specifically to identify, by name or otherwise, a single similarly situated non-Black/African American CHC Service Coordinator who was treated better than her, Plaintiff could only say, "I don't remember their names," but "I know I got treated differently than my peers." Ex. 6, Pl. Dep. Tr. at 189:2-191:9.  She could not describe these comparators in any way and indicated that she does not recall a single detail that would identify them.  Id.  Further, Plaintiff admitted that she has no knowledge of other employees' disciplinary or HR files or how they were treated by Ms. Dember with respect to supervision meetings and case assignments.  Id. at 88:3-4, 88:9-13.  Put simply, Plaintiff not only did not, but admitted that she *cannot*, produce evidence demonstrating that any of her peers were treated better than she was.

Plaintiff can likewise point to no other evidence that would give rise to an inference of discrimination.  Indeed, the objective evidence suggests the opposite:  Plaintiff's termination was the result of issues discovered during an audit of her caseload, triggered by concerns about her work performance.  See Def. Stmt. of Facts at ¶¶ 24-39.  Specifically, two different auditors, including an African American woman who had never met Plaintiff and did not know her race, reviewed a total of twenty-six (26) of Plaintiff's cases and found significant problems in almost all of them.  Id. at ¶ 38.  After reviewing the results of the audit, interviewing Plaintiff, and following up on statements Plaintiff made in the interview, HR Consultant Jacquelynne Bisch decided to terminate Plaintiff's employment.  Id. at ¶¶ 44-48.  Every step in the process—from the report of performance concerns, to the audit process, to Plaintiff's suspension and, ultimately, her termination—took place according to the Health Plan's standard practice.  Plaintiff has no circumstantial evidence that any part of this process was discriminatory.  Her conclusory allegations and unsupported beliefs are not enough at this stage.  Lin, 293 F. Supp. 2d at 518-19.

Thus, the Court should grant the Health Plan summary judgment on Plaintiff's discrimination claim.

### 2. *The Health Plan Had a Legitimate, Non-Discriminatory Reason for Its Actions.*

Ms. Bisch decided to terminate Plaintiff's employment because an audit of 26 of Plaintiff's cases found substantial evidence of Plaintiff's failure to do her job, including missing and likely falsified documentation, incomplete and overdue tasks and service plans, failures to make required contact with participants, failures to address critical incidents, and failures to escalate participant concerns. Ex. 8, O. Dember Dep. Tr. at 134:22-135:20; Ex. 5, J. Bisch Dep. Tr. at 47:17-49:16, 57:14-22. This decision was entirely legitimate and non-discriminatory. Bangura v. Pennsylvania, 793 F. App'x 142, 145 (3d Cir. 2019) (identifying performance deficits is sufficient legitimate, non-discriminatory reason); Kargbo v. Phila. Corp. for Aging, 16 F. Supp. 3d 512, 523 (E.D. Pa. 2014) (same).

### 3. *Plaintiff Cannot Establish that the Health Plan's Legitimate Reason for Terminating Her is Pretext for Discrimination.*

Plaintiff cannot satisfy the demanding burden of showing that the Health Plan's stated reason for her termination was a pretext for race discrimination. "In order to prevail under [Section 1981], a plaintiff must prove purposeful discrimination," which requires a showing that Defendant's proffered reason for the decision was pretextual, as required by the third step of the McDonnell Douglas burden-shifting framework. Doe v. Apria Healthcare Group Inc., 97 F. Supp. 3d 638, 642 (E.D. Pa. 2015) (discussing standards applicable to Section 1981 cases involving indirect or circumstantial evidence). Specifically, "once the defendant has given a non-discriminatory reason for its actions, the plaintiff seeking to defeat a summary judgment motion must produce or point to some evidence, in addition to the basic facts necessary to establish the *prima facie* case, indicating that the defendant's reason is pretextual." Chauhan v. M. Alfieri Co.,

16

Inc., 897 F.2d 123, 127-28 (3d Cir. 1990).  At the pretext stage and throughout the application of

the burden-shifting framework, "the ultimate burden of proving intentional discrimination always

rests with the plaintiff."  Apria, 97 F. Supp. 3d at 643 (citing Fuentes v. Perskie, 32 F.3d 759, 764

(3d Cir. 1994)).

　　　　Plaintiff's burden is a "difficult" one, requiring more than her own speculation that her race

was the reason for her termination.  Fuentes, 32 F.3d at 764.  Rather, Plaintiff must present

evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated

legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not

a motivating or determinative cause of the employer's action."  Id.  Because the ultimate issue is

whether the employer's decision was motivated by discriminatory animus, it is not enough for

Plaintiff to show that the Health Plan was wrong in its decision to terminate her.  Id.  Rather, she

must present evidence that the Health Plan's articulated reason for her termination was "either a

*post hoc* fabrication or otherwise did not actually motivate the employment action."  Id.  To do

this, Plaintiff must point to specific facts that undermine the stated reason for her termination and

suggest a discriminatory motive.  Id.  Her own opinion, without some objective evidence, is not

enough to carry her burden.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413-14 (3d Cir. 1999).

　　　　Plaintiff cannot meet her burden or present any objective evidence that would raise doubt

as to the Health Plan's motivation for terminating her because she admitted under oath that she

herself *has no idea* what the Health Plan's motivation was.  Ex. 6, Pl. Dep. Tr. at 183:9-12 ("I

don't know why they treated me differently."); 162:5-11 ("I don't know why [Ms. Dember] would

target me.").  This Court has repeatedly held that speculative allegations based on one's own

beliefs are not enough to survive summary judgment.  McLintock v. City of Philadelphia, 504 F.

Supp. 3d 411, 424 (E.D. Pa. 2020) (no pretext where record supported employer's reason and it

was "plaintiff alone" who believed her allegations of race discrimination); Gilbert, 564 F. Supp. 2d at 437; Jones, 198 F.3d at 413-14.  Thus, the Court should grant summary judgment in favor of the Health Plan on that basis alone.

Notwithstanding the fact that the basis for Plaintiff's claims are only her own unsupported guesses about the Health Plan's motivation, Plaintiff's claims would still fail at the pretext stage because the Health Plan has produced evidence that an audit of Plaintiff's caseload was the reason for her termination and the Court is "neither permitted to get involved in the subjective business decision of the employer, nor set its own employment standards for the employer." Ruff v. Temple Univ., 122 F. Supp. 3d 212, 218 (E.D. Pa. 2015) (granting summary judgment as to race discrimination claims under Title VII and Section 1981) (quotations omitted).  The "question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" Moss v. Nat'l Railroad Passengers Corp., No. 18-1262, 2019 WL 4697603, at *14, 19-20 (E.D. Pa. Sep. 26, 2019) (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997)) (granting summary judgment on Section 1981 claim where plaintiff had nothing more than speculation that the employer's business decision was motivated by race discrimination, including "no personal experience with the decision-maker that is suggestive of bias"); Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) ("what matters is the perception of the decision maker"); Lassiter v. Children's Hosp. of Phila., 131 F. Supp. 3d 331, 348 (E.D. Pa. 2015); Chiaradonna v. Rosemont Coll., 2008 WL 282253 at *6 (E.D. Pa. Jan. 31, 2008); Ziegler v. Del. Cty. Daily Times, 128 F. Supp. 2d 790, 811 (E.D. Pa. 2001) (evidence that decisionmakers were wrong does not discredit the proffered reason for terminating plaintiff).

The Health Plan has maintained since the day Plaintiff was terminated that the reason for her termination was the results of the audit of her caseload, which objectively showed that Plaintiff

18