## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHANEENA S. HOLLAND-CARTER, | : | |
| | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | **NO. 22-3542** |
| UPMC HEALTH PLAN, INC., | : | |
| | : | |
| *Defendant*. | : | |

**Goldberg, J.**                                                                                    **November 7, 2024**

## <u>MEMORANDUM OPINION</u>

Plaintiff Shaneena Holland-Carter brings this case against her former employer, Defendant UPMC Health Plan Inc., for racial discrimination pursuant to 42 U.S.C. § 1981. Plaintiff contends that in March 2022, she was terminated by Defendant on the basis of her race. Defendant now seeks summary judgment arguing that she has failed to point to sufficient facts on which a factfinder could find discrimination. For the following reasons, I will grant the Motion and enter judgment in favor of Defendant.

## I.    STATEMENT OF FACTS

The following facts are derived from the evidence submitted by the parties and are undisputed unless noted. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiffs.[1]

### A.    <u>Defendant UPMC</u>

Defendant is a non-profit health plan owned by the University of Pittsburgh Medical Center. (DSUF ¶ 1; PR ¶ 1.) It offers care to its participants through its Community Health Choices ("CHC")

---

[1]         References to the parties' pleadings will be made as follows: Defendants' Statement of Undisputed Facts ("DSUF"), Plaintiffs' Response ("PR"), and Plaintiffs' Counterstatement of Undisputed Facts ("PSUF"). To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions. If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits. If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute. I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

division, which is a Medicaid program that allows managed care organizations like Defendant to coordinate medical care and long-term services and support for qualified individuals. (DSUF ¶ 2; PR ¶ 2.) Defendant employs CHC Service Coordinators throughout various regions in Pennsylvania to facilitate these services for its participants/members. (Id.)

**B.  Plaintiff's Employment**

Plaintiff, a black woman, began working full-time for Defendant as a CHC Service Coordinator in its Southeastern Pennsylvania region in April 2019. (DSUF ¶ 4; PR ¶ 4.) In that role, Plaintiff was responsible for coordinating healthcare as well as home- and community-based services for assigned participants who needed assistance from others to complete activities, usually due to sickness, disability, or some other limitation. (DSUF ¶ 5; PR ¶ 5.)

Plaintiff's job required her to "conduct assessments, maintain communication with the parties that are involved with the [participants], keep track of [participants'] charts," and related tasks. (DSUF ¶ 6; PR ¶ 6.) Plaintiff was also responsible for leading the Person-Centered Service Planning ("PCSP") and adhering to Defendant's policies and procedures relating to service coordination for her assigned participants. (DSUF ¶ 7; PR ¶ 7.) To fulfill her job responsibilities, Plaintiff was required to enter data regarding her assigned cases and participants into Defendant's electronic system, known as Helios. (DSUF ¶ 8; PR ¶ 8.) Plaintiff was never employed as a supervisor and did not have responsibility for or involvement with disciplining other employees. (DSUF ¶ 9; PR ¶ 9.)

In August 2021, Olga Dember (white female), a Service Coordinator Supervisor, began supervising Plaintiff. (DSUF ¶ 10; PR ¶ 10.) At the time she became Plaintiff's supervisor, Ms. Dember also managed twelve other Service Coordinators—five black females, five white females, one black male, and one white male. (Def.'s Ex. 8, Dep. of Olga Dember ("Dember Dep.") 24:11–28:4.) During her supervision of these employees, Ms. Dember put two of the black females on a development plan, which is a non-disciplinary plan aimed at improving performance. (Id. at 28:5–25.) Ms. Dember was also

involved in the termination of another black female Service Coordinator, who later came under her supervision. (Id. at 47:8–48:23.)

From October through January, entries on MicroSoft Teams Chats reflect several instances where Ms. Dember requested that Plaintiff schedule supervision meetings, join already scheduled meetings, complete missing forms, and properly complete documentation. (Def.'s Ex. 9 at UPMC0805, 0818, 908–10, 955.) During a supervision meeting on October 19, 2021, Ms. Dember and Plaintiff discussed "Concerning Cases/Participant Issues," that involved items "not completed in a timely manner," "expired tasks," "multiple overdue tasks," and "[n]o follow up" regarding certain issues. (Def.'s Ex. 10.)

The day after the October 19, 2021 supervision meeting, Plaintiff requested a leave of absence through Defendant's outside provider. The request was granted, and Plaintiff was out from October 20 to December 6, 2021. (DSUF ¶ 14; PR ¶ 14.) Ms. Dember reassigned Plaintiff's caseload to other service coordinators on her team. (DSUF ¶ 16; PR ¶ 16.) While Plaintiff was on leave, Ms. Dember learned about a report from a participant regarding unprofessional conduct by Plaintiff. (DSUF ¶ 17; PR ¶ 17.) When she returned from leave in December 2021, Ms. Dember held a supervision meeting with Plaintiff and addressed the seven following issues:

- Need to make sure completing initial assessments, reassessments, trigger events in a timely manner (prior to leave initial assessment hadn't had contact in weeks)
- Need to complete CI follow up in a timely manner
- Need to report requests to switch SC to supervisor
- Need to address tasks in a timely manner (prior to leave had 108 tasks)
- Need to speak to UPMC staff and participants in a professional manner
- Need to attend scheduled supervisions, meetings and huddles
- Reminder: The one hour lunch breach should include your travel to and from the destination.

(Def.'s Ex. 12.) At deposition, Ms. Dember testified that these performance issues had been identified before Plaintiff went out on leave. (Dember Dep. 106:3–9.)

In early January 2022, Ms. Dember and her supervisor—Long Term Supportive Services Manager Renaldo Mendez (Hispanic/Latino male)—contacted Human Resources Consultant Jacquelynne Bisch

(white female) to discuss Plaintiff's work performance. (DSUF ¶ 19; PR ¶ 19.) Ms. Dember also reported that third-party complaints had been made about Plaintiff, including that Plaintiff had accepted a bribe from a participant. (DSUF ¶ 20; PR ¶ 20.) Ms. Bisch directed Ms. Dember and Mr. Mendez to conduct an audit of Plaintiff's cases in order to review whether applicable policies and procedures were being followed and to identify any potential issues. (DSUF ¶ 21; PR ¶ 21.) On January 12, 2023, Ms. Bisch contacted Senior Compliance Manager Heather Pope (white female), to explain that she had received concerns from Plaintiff's supervisor about outstanding tasks and other documentation errors, and to describe the participant complaint regarding the alleged bribes. (Def.'s Ex. 14 (Dep. of Heather Pope ("Pope Dep.") 25:3–20.)

### C. The Audit of Plaintiff's Caseload

Ms. Bisch explained that audits were used if managers had concerns about more serious participant safety issues. (Def.'s Ex. 5, Dep. of Jacquelynne Bisch ("Bisch Dep."), 30:20–31:1.) The audit of Plaintiff was initiated to ensure that she was completing the appropriate documentation and required Service Coordinator tasks. (Pope Dep. 45:11–16.)

On January 14, 2022, at Ms. Bisch's request, Ms. Dember conducted an audit of ten of Plaintiff's cases. (DSUF ¶ 24; PR ¶ 24; Def.'s Ex. 15.) Ms. Dember did not disclose the audit to Plaintiff, who was not aware that it was being conducted. (DSUF ¶ 25; PR ¶ 25.) Ms. Dember found that Plaintiff's cases had missing documentation, incomplete tasks, and care plans that had not been updated. (DSUF ¶ 32; PR ¶ 32.)

After Ms. Dember conducted the initial audit, Patricia Ratwani, Mr. Mendez's supervisor, decided that an "unbiased" person should complete the audit. (Mendez Dep. 41:10–13.) Ms. Bisch requested that Audrey Moore (black female), a Senior Telephonic Case Manager, conduct an audit of additional cases from Plaintiff's caseload. (DSUF ¶ 33; PR ¶ 33.) Ms. Moore never met or interacted with Plaintiff and thus did not know Plaintiff's race at the time of the audit. (DSUF ¶ 36; PR ¶ 36.) The additional audits were requested in order to ensure HR and Compliance understood the "bigger picture" of Plaintiff's

caseload given that Plaintiff had taken a leave of absence a few months before the audit. Specifically, HR wanted to "make a better, fairer determination of what was going on" with Plaintiff's cases. (Pope Dep. 41:23–42:20.) On January 26, 2022, Ms. Moore completed an audit of ten additional cases from Plaintiff's caseload and found outdated care plans, care plans with missing authorizations, and participants who did not have monthly outreach calls, among other issues. (DSUF ¶ 35; PR ¶ 35.)

On January 31, 2022, at Ms. Bisch's request, Ms. Dember added a participant to the list of cases audited. With this particular participant, Ms. Dember found that a report of possible neglect and exploitation by one of the providers had not been referred by Plaintiff to Adult Protective Services ("APS"), as required Defendant. Ms. Dember also noted that Plaintiff recorded an assessment in the system, but the participant's daughter and a provider reported that no such assessment had occurred and that the last time Plaintiff saw the participant was three months before the assessment date Plaintiff had put in the system. (DSUF ¶ 37; PR ¶ 37.) The next day, Ms. Moore completed an audit of five additional cases assigned to Plaintiff , bringing the total number of Plaintiff's cases audited to twenty-six. This latest audit also revealed expired care plans, missing information, and inconsistent or undocumented participant contact. (Def.'s Ex. 22.)

In addition to auditing specific cases, Ms. Pope requested that Mr. Mendez pull Plaintiff's outstanding person-centered service plan ("PCSP") and task lists for review. (DSUF ¶ 39; PR ¶ 39.) Ms. Pope testified that, upon review of that report, she discovered that Plaintiff had sixty outstanding tasks including fifty that were marked past due. (Pope Dep. 31:23–32:12.)

### D.  **Other Issues between Plaintiff and Ms. Dember**

In this same time period, Plaintiff and Ms. Dember had several problematic interactions with Plaintiff.

First, on January 3, 2022, Ms. Dember asked Plaintiff to properly record if she took time off, and Plaintiff responded that she had to pick up her child from school and that Ms. Dember should "refrain from reprimanding" her. ((Def.'s Ex. 6, Dep. of Shaneena Holland-Carter ("Holland-Carter Dep.") 132:1–

5.; Def.'s Ex. 9 at UPMC908–10.) Approximately one week later, Plaintiff emailed Ms. Dember and stated, "I don't want you to feel like I was attacking you personally. I just wanted to emphasize that communication was suggested, we took action and now were good!" (Def.'s Ex. 9 at UPMC 911.)

On January 12, 2024, Ms. Dember sent an email to Plaintiff and another employee indicating that she was switching a participant from Plaintiff's caseload to the other employee. (Def.'s Ex. 16.) Approximately two weeks later, Plaintiff emailed Ms. Dember, accusing her of not having informed Plaintiff about the participant transfer. (Id.)

On February 7, 2022, Mr. Mendez attended the beginning of a Supervision meeting between Plaintiff and Ms. Dember. The meeting continued on February 8th, without Mr. Mendez. (DSUF ¶ 29; PR ¶ 29.) After that meeting, Ms. Dember sent the following email to Mr. Mendez:

> I'm writing this email because I need to notify you of what happened. Shaneena Holland-Carter and I tried to continue our supervision this morning. We were unable to finish in the time we had yesterday so rescheduled to 11a.m today. We started off the supervision well, but when I tried to address the issue we had with participant AY and the fact that she needs to be very clear when communicating what a voluntary withdrawal to participants, she became very defensive. I tried to explain the purpose was just to be clear on how to move forward, but she wasn't receptive.
>
> The real issue came up when I saw that she had authorized services for a participant just this morning without finishing an assessment. I tried to address that this is something we'd previously discussed and is not something she we [sic] can or should do. She was insistent that the participant was in emergent need and that she had a reason for doing this. When I explained that she cannot make that decision on her own she refused to accept any responsibility. She gave me a fairly lengthy speech about how this is all about a power struggle between us even though I was quite clear that the goal of the supervision is to help her provide the best care and that if we can find any deficiencies or issues we actually improve the quality of care she's able to provide moving forward. Unfortunately she did not want to let me speak and during her speech she mate [sic] the statement "**I refute all demonic oppressive supervisory**" influence. I am very concerned about this statement. I asked her to repeat herself but she refused to do so. After making that statement she answered a few questions and then stopped responding to me at all until I had to end the call.

(Def.'s Ex. 18 (emphasis in original).) Mr. Mendez recalls that Ms. Dember came to her very distraught about the whole situation. (Def.'s Ex. 24, Dep. of Renaldo Mendez ("Mendez Dep.") 68:4–18.)

The following day, at Mr. Mendez's urging, Ms. Dember sent a follow up email to her supervisors and Human Resources:

> I wanted to bring something else to your attention. I spoke to Rey about this and he stated that I should mention the severity of what Shaneena said. I'm not sure if you're aware, I am Jewish. And it is a common antisemitic trope to call Jews satan or demon. In my opinion this amounts to discrimination on the basis of my religion.

(Id.) At her deposition, Plaintiff could not recall ever saying anything about "demonic supervisory influence." (Holland-Carter Dep. 156:3–18.)

### E.  **Plaintiff's Suspension and Termination**

Due to Ms. Bisch and Ms. Pope's analysis of the audit results—which showed numerous instances of lack of contact with participants, failure to report participant concerns and follow up on critical incidents, and failure to complete documentation—Ms. Bisch decided to suspend Plaintiff's employment. (DSUF ¶¶ 40–42; PR ¶¶ 40–42.)

On February 14, 2022, Ms. Bisch and Ms. Pope met with Plaintiff to review the audit results and inform her of the suspension. (DSUF ¶ 42; PR ¶ 42.) Although Plaintiff challenged some of what the audits disclosed, she did not dispute that she had failed to complete certain documentation, make the APS report, and comply with certain HIPAA requirements. (DSUF ¶ 43; PR ¶ 43.) Subsequently, Ms. Bisch and Ms. Pope met with Mr. Mendez to review what Plaintiff had told them. (DSUF ¶ 44; PR ¶ 44.) Based on that conversation, Ms. Bisch testified at her deposition that she concluded that Plaintiff was being dishonest in the meeting. (Bisch Dep. 71:3–15.) Specifically, according to Ms. Bisch, Plaintiff indicated that: (a) she was working with a case manager, but there was no such indication of that in the records; (b) there were some notes in draft, but no such notes were found; and (c) she was unaware of the HIPAA policy, even though Ms. Bisch knew that employees are trained on HIPAA from onboarding. Finally, Ms.

Bisch noted that Plaintiff admitted to having conversations with third parties without a personal designated representative form on file, in violation of HIPAA. (Bisch Dep. 59:8–23.)

Ms. Bisch testified that, based on the audit and subsequent events, she decided to terminate Plaintiff. (Id. at 49:14-24.) She consulted with Mr. Mendez who agreed with the decision. (Mendez Dep. 46:2–47:23, 49:9–19.) Mr. Mendez explained that Plaintiff "was clearly terminated because of the infractions in her work performance. It was clearly a work performance termination. She was putting the health and safety of the participants at risk by her lack of work performance or lack of work ethic." (Id. at 49:13–18.) Ms. Dember had no role in the decision to suspend or terminate Plaintiff. (Id. at 48:8–17.)

Plaintiff was formally informed of her termination by letter dated March 29, 2022. (DSUF ¶ 50; PR ¶ 50.)

### F.  **Plaintiff's Post-Audit Complaint About Her Caseload**

Defendant assigns cases to Service Coordinators based on availability, location, and whether the participant has any particular needs; assignment is usually within a fifty-mile radius of a Service Coordinator's home. (DSUF ¶ 53; PR ¶ 53.) Case assignments are generally handled by a Service Coordinator's supervisor, in this case, Ms. Dember. (DSUF ¶ 54; PR ¶ 54.)

At some point in late January or early February 2022, Plaintiff called Ms. Bisch to complain about the assignment of her caseload. (DSUF ¶ 51; PR ¶ 51.) During the call, Plaintiff told Ms. Bisch that she had moved from Philadelphia to Delaware county and wanted to be reassigned to cases closer to her new home. (DSUF ¶ 52; PR ¶ 52.)  When Ms. Bisch directed Plaintiff to speak with Ms. Dember regarding her request, Plaintiff told Ms. Bisch that Ms. Dember had been treating her unfairly, including "excessively long meetings," multiple supervision sessions within a week, and "lack of follow up" on "supervisor tasks." She also claimed that Ms. Dember was "rude and disrespectful" and "undermine[d] [her] work and capabilities. (DSUF ¶¶ 56–57; PR ¶¶ 56–57.) Later, Plaintiff claimed that Ms. Dember was "forceful" in her approach toward managing Plaintiff, meaning that Ms. Dember asked a lot of questions about her caseload and made Plaintiff perform tasks herself. (DSUF ¶ 58; PR ¶ 58.) Ms. Bisch

told Plaintiff that if she had any other concerns, she should email them to her. (DSUF ¶ 61; PR ¶ 61.) Plaintiff recalled feeling "unsupported" by Ms. Bisch. (DSUF ¶ 59; PR ¶ 59.)

**G. Plaintiff's Post-Suspension Help Line Report**

On February 15, 2022, after she was suspended, Plaintiff contacted Defendant's third-party Help Line. In her report, she alleged that Ms. Dember retaliated against her because Plaintiff had requested that Mr. Mendez attend their supervision meeting on February 7, 2022. Plaintiff mentioned neither race discrimination nor her conversation with Ms. Bisch from a few weeks earlier. (DSUF ¶ 62; PR ¶ 62; Def.'s Ex. 27.) Plaintiff noted that this was her first such report to the Help Line. (DSUF ¶ 63; PR ¶ 63.)

On February 18, 2022, Plaintiff initiated a second call to the Help Line to follow up on her first call but did not report any new information. (DSUF ¶ 64; PR ¶ 64.) Ms. Pope initially received Plaintiff's Help Line reports but recused herself from the investigation since she had already been involved with Plaintiff's suspension. (DSUF ¶ 65; PR ¶ 65.) Plaintiff's Help Line reports were investigated and determined to be unsubstantiated based on the information provided. (Def.'s Ex. 28.)

**H. Plaintiff's Post-Termination Work**

Plaintiff's position with Defendant was a full-time position earning $52,000 per year. (DSUF ¶ 68; PR ¶ 68.) Prior to her suspension, Plaintiff applied to a Ph.D. program at Walden University. (DSUF ¶ 69; PR ¶ 69.) After her separation, Plaintiff was enrolled in the Walden University Ph.D. program on a full-time basis from approximately February 28, 2022 through February 19, 2023. (DSUF ¶ 70; PR ¶ 70.) When Plaintiff applied for unemployment compensation following her separation from the Health Plan, she swore under oath that she was no longer willing or able to work full time as she had at the Health Plan, but instead would only be available for up to twelve hours of work per week. (DSUF ¶ 71 PR ¶ 71.)

In March 2023, approximately one year after her separation from Defendant, and just a few weeks after she first applied to the job, Plaintiff accepted a Service Coordinator job with AmeriHealth Caritas/Keystone First, where she still works today, earning approximately $62,000 per year plus benefits. (DSUF ¶ 72; PR ¶ 72.)

### I.  <u>Plaintiff's Basis for Alleging Racial Discrimination</u>

When asked at her deposition to name the individuals she believes discriminated against her, Plaintiff identified Ms. Dember, Ms. Bisch, and Patricia Ratwani (Mr. Mendez's supervisor). (DSUF ¶ 73; PR ¶ 73.) When asked "Why do you believe you were treated differently because of your race?" she replied, "I don't know why they treated me differently." (Holland-Carter Dep. 183:9–12.)

Regarding Ms. Ratwani, Plaintiff stated, "I'm not sure if she was the culprit of Olga [Dember]'s behaviors and her micromanaging style. I don't know if she was the culprit of the audit. I don't know what—I'm not sure, but I do suspect she was the culprit." (<u>Id.</u> at 175:13–23.) Plaintiff believed that Ms. Ratawi filed a complaint against her that got her suspended and ultimately fired based on Ms. Ratwani's questions about her intermittent leave, but she was not sure Ms. Ratwani was actually involved. (<u>Id.</u> at 173:15–174:24, 176:3–23.)

Regarding Ms. Bisch, Plaintiff complained that she made her feel "unsupported" when she complained about Ms. Dember's refusal to reassign Plaintiff's caseload after moving. (<u>Id.</u> at 96:1–16.)

As to Ms. Dember, Plaintiff did not know why Ms. Dember would "target" her. (<u>Id.</u> at 162:5–11.) Plaintiff admitted that she had never been present at any of Ms. Dember's supervision meetings with colleagues. (<u>Id.</u> at 152:11–14.) Plaintiff could not specifically identify any non-black Service Coordinator who was treated differently than her for similar transgressions but stated that there were others whose names she did not know. (<u>Id.</u> at 189:23–191:9.)

### II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

"Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue in rebuttal. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

**III.    DISCUSSION**

**A.    Discrimination Claims Under § 1981**

To establish a claim for racial discrimination under 42 U.S.C. § 1981, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire. Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983). A plaintiff may succeed in a discrimination claim against an employer either by (1) providing direct evidence of unlawful discrimination, or (2) by relying on indirect evidence of discrimination through the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). McIlvaine v. ISEO Techs., Inc., 485 F. Supp. 3d 582, 585–86 (E.D. Pa. 2020) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999)).

Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without an inference or presumption. Torres v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994) (emphasis and quotations omitted). Direct evidence is "described as overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision." Weightman v. Bank of New York Mellon Corp., 772 F. Supp. 2d 693 (W.D. Pa. 2011) (citing Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004)). Plaintiff concedes that she has no direct evidence of discrimination.

Absent direct evidence of discrimination, a plaintiff must rely on the McDonnell Douglas burden-shifting framework. Under this framework, the plaintiff must first prove by a preponderance of evidence a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. Id. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981). Rather, the defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was done for legitimate, nondiscriminatory reasons. Id. Finally, if the employer meets its burden of production, the plaintiff bears the ultimate burden of convincing the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Here, Defendant contends that Plaintiff has not produced evidence from which a reasonable factfinder could determine that she has met all elements of a *prima facie* case. In addition, Defendant asserts that, even if a *prima case* were present, Plaintiff has failed to create a genuine issue of material fact as to whether Defendant's legitimate, non-discriminatory reason for terminating Plaintiff was pretext.

1. *Prima Facie* Case

To establish a *prima facie* case of racial discrimination, a plaintiff must show that she (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999). Here, the sole element in dispute is the fourth element—inference of discrimination.

To create an inference of discrimination, a plaintiff can satisfy his or her burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990). A plaintiff may "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." Greene v. Virgin Islands Water & Power Auth., 557 F. Appx. 189, 195 (3d Cir. 2014). Alternatively, a plaintiff can demonstrate that he was treated less favorably than similarly situated employees outside of the protected class. Jones, 198 F.3d at 413.

While "similarly-situated" does not necessarily mean identically situated, the identified comparators must nevertheless be similar in "all relevant respects" to the plaintiff. Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222–23 (3d Cir. 2009) (quotation omitted). This often requires a showing that the relevant aspects of the plaintiff's employment situation are "'nearly identical' to those of the co-workers that the plaintiff alleges were treated more favorably." Hobson v. St. Luke's Hosp. & Health Network, 735 F. Supp. 2d 206, 214 (E.D. Pa. 2010) (citing Solomon v. Philadelphia Newspapers, Inc., No. 05-cv-5326, 2008 WL 2221856, at *15 (E.D. Pa. May 21, 2008)). Demonstrating that employees are similarly situated often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Opsatnik, 335 F. App'x at 223 (quotations omitted). To that end, a plaintiff must demonstrate "that the

other employee's acts were of 'comparable seriousness' to his own infraction." <u>Anderson v. Haverford College</u>, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting <u>Lanear v. Safeway Grocery</u>, 843 F.2d 298, 301 (8th Cir. 1988)). Whether a particular fact or circumstance is relevant for purposes of a "similarly-situated" analysis must be determined by the context of each case. <u>Hobson</u>, 735 F. Supp. 2d at 214 (citing <u>Houston v. Easton Area Sch. Dist.</u>, 355 F. App'x 651, 654 (3d Cir. 2009)).

Here, Plaintiff fails to point to a similarly-situated comparator who was treated better than her. Indeed, when Plaintiff was asked to identify non-black Service Coordinators that received more favorable treatment, she simply responded that "I don't remember their names," but "I know I got treated differently than my peers." (Holland-Carter Dep. 189:2–191:9.) She could not recall any details that would identify these employees, admitted she had no knowledge of their personnel files, and conceded that she was not privy to Ms. Dember's treatment of them with respect to supervision meetings and case assignments. (<u>Id.</u>)

Plaintiff also does not point to any other evidence that would give rise to an inference of discrimination, such as racially-charged comments or clear differential treatment. This is particularly notable given the abundant evidence—including Plaintiff's own admission—that she had serious performance issues.

In an effort to create a causal connection between her race and her termination, Plaintiff argues that Ms. Dember, her direct supervisor, "had a demonstrated history of bias against black females." (Pl.'s Resp. 8.) According to Plaintiff, in the short time between when Ms. Dember became a supervisor in August 2021 and Plaintiff was suspended in February 2022, she only disciplined black females: Tike Steepe (put on a development plan), J. Lewis (put on a development plan), Kendra Prussien (terminated), and herself (terminated). Even viewed favorably such evidence is insufficient to establish an inference of discrimination. Primarily, it is undisputed that Ms. Dember had no role in the decision to terminate Plaintiff, making her particular bias less material. <u>See</u> <u>Walden v. Georgia-Pacific Corp.</u>, 126 F.3d 506, 521 (3d Cir. 1997) (while remarks or the conduct of non-decisionmakers may sometimes provide

"evidence of the atmosphere in which the employment decision was carried out," such evidence standing alone is "inadequate to support an inference of discrimination.").

Moreover, of the eight black employees Ms. Dember supervised in that time, only four received some type of corrective action. Two of those employees, Steepe and Lewis, were simply put on a development plan, which is not considered an adverse employment action, but rather a plan "aimed at improving performance" that does not go into an employee's permanent record. (Dember Dep. 29:22–25.) Indeed, in her response in opposition to summary judgment, Plaintiff complains that she was not offered a development plan like these other two employees, suggesting her recognition that the development plan does not constitute unfavorable treatment. (Pl.'s Opp'n Summ. J. 8–9.) As to Ms. Prussien—the only Service Coordinator other than Plaintiff who was terminated—the evidence is undisputed that she was "not doing her job . . . [h]er assessments were duplicated with basically no change. There was documentation missing, I believe there was some fraudulent assessments that were documented, and participants were not getting appropriate care." (Dember Dep. 48:10–18.) Plaintiff has not adduced any evidence on which to either undermine that testimony or infer that race played a role in the terminations.

Plaintiff rest her discrimination claim on the assertion that only black employees were disciplined, but produces no additional evidence from which a reasonable jury could find that she was terminated on the basis of race. Plaintiff does not identify any non-black employee who committed the same transgressions and was not disciplined. Moreover, the mere fact that Ms. Dember may have disciplined another black female does not—standing alone—allow any factfinder to make the broad, and otherwise unsubstantiated, leap that Plaintiff's own termination by Ms. Bisch was connected to her race. Accordingly, I find that Plaintiff has failed to meet her burden of creating a genuine issue of material fact as to her *prima facie* case of discrimination.

2. <u>Whether Defendant's Legitimate Non-Discriminatory Reason Was Pretext for Discrimination</u>

Even assuming Plaintiff could establish a *prima face* case, she fails to survive summary judgment at the next step of the <u>McDonnell Douglas</u> test. As noted above, if a plaintiff establishes a *prima facie* case of discrimination, there is a "presumption" of discrimination, and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. <u>McDonnell Douglas</u>, 411 U.S. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." <u>Burdine</u> 450 U.S. at 254. Rather, the defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. <u>Id.</u>

Once the defendant has satisfied its burden of production at the second stage, the court turns to the third and final aspect, which "is usually the determinative stage of the case." <u>Jones</u>, 198 F.3d at 412. "In order to survive summary judgment when an employer has articulated a legitimate non-discriminatory reason for its action, a plaintiff must submit evidence from which a reasonable fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) conclude that discrimination was more likely than not a motivating or determinative cause of the employer's action." <u>Saellam v. Norfolk Southern Corp.</u>, No. 06-cv-123, 2008 WL 5286836, at *7 (W.D. Pa. Dec. 19, 2008).

Under the first method, the plaintiff "need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, . . . nor produce additional evidence beyond her prima facie case.'" <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 644 (3d Cir. 1998). However, the plaintiff also cannot simply show that the employer's decision was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." <u>Fuentes</u>, 32 F.3d at 765. The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-

discriminatory reasons." Id.; see also Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) ("[The plaintiff] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.").

To show pretext under the second method—that discrimination was more likely than not a cause for the employer's action—"the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that" the plaintiff's protected trait "was a motivating or determinative factor in the employment decision." Simpson, 142 F.3d at 644–45. Among other things, the plaintiff may show that the employer has previously discriminated against him/her, has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645. Ultimately, the burden of proving pretext is a difficult one. Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).

Plaintiff's opposition to Defendant's Motion for Summary Judgment "acknowledges [that] [D]efendant has articulated a legitimate, non-discriminatory reason for suspending and terminating her." (Pl.'s Opp'n Summ. J. 8.) Ms. Bisch testified that she terminated Plaintiff based on the audit results, which showed numerous instances of lack of contact with participants, failure to report participant concerns and follow up on critical incidents, and failure to complete documentation. (DSUF ¶¶ 40–42; PR ¶ 40–42.) Mr. Mendez corroborated this basis, testifying that Plaintiff "was clearly terminated because of the infractions in her work performance. It was clearly a work performance termination. She was putting the health and safety of the participants at risk by her lack of work performance or lack of work ethic." (Mendez Dep. 49:13–18.) Plaintiff concedes that the audit of her caseload revealed numerous performance issues, (DSUF ¶¶ 40–41; PR ¶¶ 40–41.).

In an effort to undermine Defendant's stated nondiscriminatory reason for her termination, Plaintiff points to multiple alleged "facts" that create an inference that these stated reasons are mere pretext for discrimination. I address each individually.

First, Plaintiff argues that "despite the fact that [D]efendant utilizes a progressive disciplinary system, Ms. Dember never gave Ms. Holland-Carter a formal verbal warning or formal written warning about her alleged performance issues." (Pl.'s Opp'n Summ. J. 8.)

It is undisputed, however, that Defendant's policy specifically provides that, "[d]ischarge may be used even without prior progressive action to address more serious violations." (Pl.'s Ex. 11 at 0391.) Ms. Bisch testified that Plaintiff had committed multiple infractions, including not "adhering to the process for approving hours, [and] just randomly determining direct care worker hours, which could potentially lead to either fraud or participants not having enough services. There were participants on her caseload that hadn't had outreach since 2020. She was leaving things in draft. Cases that required reporting due to fraud, waste, and abuse that had not done so." (Bisch Dep. 56:25–57:7.) She remarked that the "participant safety concerns were glaring." (Id. at 58:1–2.) Plaintiff does not dispute that she had failed to complete certain documentation, make the APS report, and comply with certain HIPAA requirements. (DSUF ¶ 43; PR ¶ 43.)

Second, Plaintiff argues that Ms. Dember "consistently alleged that [Plaintiff] had 108 outstanding tasks at the time she went out on leave in October 2021. However, defendant never produced any evidence to corroborate that claim." (Pl.'s Opp'n Summ. J. 8.)

Plaintiff fails to create a factual dispute on this point. Contemporaneous notes from a February 22, 2022 meeting substantiate Ms. Dember's report to Ms. Bisch that Plaintiff "had over 100 outstanding tasks before she took a leave of absence." (Pl.'s Ex. 13.) In the face of this evidence, the burden is on Plaintiff to challenge that fact, either via her deposition testimony, an affidavit, or some other evidence— she has not done so.

Third, Plaintiff contends that the Service Coordinators to whom Ms. Dember assigned Plaintiff's cases when she was out on leave were supposed to complete whatever incomplete tasks existed at the time. Yet, despite her alleged bi-weekly supervision meetings with the Service Coordinators, Ms. Dember

had no idea whether all or any of the alleged 108 outstanding tasks were complete by the time she returned from leave.

A review of Ms. Dember's testimony, however, merely shows her recollection that Plaintiff had 108 tasks open before her leave and that the service coordinators to whom Plaintiff's cases were distributed were responsible for completing those tasks. (Dember Dep. 99:8–103:13.) Whether the tasks were completed by others has no bearing on whether Plaintiff had performance issues prior to her taking leave or whether Defendant's reasons for Plaintiff's termination were pretextual.

Fourth, Plaintiff attempts to cast doubt on Ms. Dember's testimony regarding performance issues, arguing that:

- "Ms. Dember identified two issues she claimed existed as of and prior to the December 10, 2021 Supervision Meeting that supporting disciplining [Plaintiff]: 1) she did not attend scheduled meetings, and 2) she did not attend scheduled 'huddles.' However, [D]efendant produced no evidence to corroborate or substantiate either of those allegations, other than the December 10, 2021 Supervision Template prepared by Ms. Dember." (Pl.'s Opp'n Summ. J. 9.)

- "[A]s late as the supervision meeting held on December 13, 2021, Ms. Dember stated that the 71 outstanding tasks [Plaintiff] had to complete at that time was within reason. More importantly, Ms. Dember admitted that because [Plaintiff] had been back to work only one week, she could not determine whether [Plaintiff] had any performance issues that would have necessitated putting her on a development plan." (Id.)

Again, however, this evidence is immaterial given that Defendant's stated reason for terminating Plaintiff was based not on her prior failure to complete tasks, but rather on the results of the audit in early 2022. Moreover, contrary to Plaintiff's allegation, Defendant has produced evidence to support Plaintiff's pre-audit performance issues. During a supervision meeting that Ms. Dember held with Plaintiff on October 19, 2021, Ms. Dember and Plaintiff discussed "Concerning Cases/Participant Issues," that involved items "not completed in a timely manner," "expired tasks," "multiple overdue tasks," and "[n]o follow up" regarding certain issues. (Def.'s Ex. 10.) While Plaintiff was on leave, Ms. Dember learned about a report from a participant of unprofessional conduct by Plaintiff. (DSUF ¶ 17; PR ¶ 17.) After

Plaintiff returned from leave in December 2021, Ms. Dember held a supervision meeting in order to address seven issues that were identified before Plaintiff went out on leave. (Dember Dep. 106:3–9.) Plaintiff has not met her burden of producing evidence to rebut this showing.

Fifth, Plaintiff challenges Defendant's decision not to put her on a development plan to allow her to improve her performance, claiming that Defendant failed to even consider an intermediate step before termination. Ms. Dember explained that the decision was made by leadership and HR. (Dember Dep. 36:17–22.) Ms. Bisch was not asked about her decision to not put Plaintiff on a development plan but was questioned about her decision to not put Plaintiff on a performance improvement plan (which is a more serious personnel action). She testified that she did not believe a performance improvement plan was appropriate because,

> I looked at the caseload on multiple occasions as we continued to evaluate [Plaintiff's] cases, and I had concerns for participant safety, lack of adherence to our HIPAA policies, not following the process with regards to approving hours . . . just randomly determining direct care work hours, which could potentially lead to either fraud or participants not having enough services. There were participants on her caseload that hadn't had outreach since 2020. She was leaving things in draft. Cases that required reporting due to fraud, waste, and abuse that had not done so. One gentleman in particular, there should have been an APS [adult protective services] referral, which was not made. Everything in its entirety led me to the decision that a performance improvement plan was not warranted due to the participant safety concerns and policy violations.

(Bisch Dep. 56:14–57:11.) Plaintiff does not dispute the veracity of Ms. Bisch's testimony but simply challenges how Defendant responded to those issues. Such a challenge is insufficient to prove pretext. See Fuentes, 32 F.3d at 765 (holding that the plaintiff cannot simply show that the employer's decision was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.").

Sixth, Plaintiff argues that although Ms. Dember claims to have randomly selected Plaintiff's cases to audit, "[g]iven Ms. Dember's demonstrated bias against Black females, it cannot be presumed

she randomly selected the cases to audit. It is more likely that she selected for audit those cases which would have put [Plaintiff] in the worst possible light." (Pl.'s Opp'n Summ. J. 10.)

Plaintiff offers no evidentiary support for this speculative argument. Quite to the contrary, Ms. Dember testified that the cases were selected randomly. (Dember Dep. 130:21–131:7.) It is undisputed that after Ms. Dember conducted the initial audit, an unbiased person was selected to complete the audit. (Mendez Dep. 41:10–13.) That individual, Audrey Moore (a black female), had never met Plaintiff and did not know her race. Plaintiff concedes that that audit found outdated care plans, care plans with missing authorizations, and participants who did not have monthly outreach calls. (DSUF ¶¶ 35–36; PR ¶¶ 35–36.)

Finally, Plaintiff sets forth a multitude of scattershot arguments in an effort to undermine Defendant's stated reasons for termination. Her arguments, however, fail to meet her burden on summary judgment review:

- She claims that the investigation "ignored key, relevant evidence," but never identifies what that evidence is. (Pl.'s Opp'n Summ J. 10.)

- She contends that although Ms. Bisch proclaims to be a human resources expert, "no court on the planet has so qualified her." (Id. at 11.) Plaintiff does not explain how that affected the audit.

- Plaintiff avers that Ms. Bisch took no action in response to Plaintiff's complaint about Ms. Dember in late January 2022 regarding reassignment of her cases. Ms. Bisch simply told Plaintiff to ask Ms. Dember again. Plaintiff conceded, however, that case assignments are generally handled by a service coordinator's supervisor, in this case, Ms. Dember. (DSUF ¶ 54; PR ¶ 54.)

- Plaintiff asserts that Ms. Bisch failed to memorialize either Plaintiff's call during which she complained about Ms. Dember or her meeting with Ms. Dember and Mr. Mendez in which the audit was discussed. Plaintiff does not explain how this establishes pretext.

- According to Plaintiff, Ms. Bisch testified that she made the decision to suspend and then terminate Plaintiff on February 14, 2022, but in the February 14, 2022 suspension letter, she stated that the investigation was ongoing. Ms. Bisch claimed that the delay between the suspension letter and the termination letter to Plaintiff was caused by "paperwork." As Ms. Bisch, explained, however, although she made the decision on February 14th, she consulted with Ms. Pope and Mr. Mendez before making the decision final.

- Plaintiff contends that, in deciding to terminate her, Ms. Bisch did not consider her prior performance evaluations, in contravention of Defendant's Corrective Action and Discharge Policy, which requires that an employee's record be given "due deliberation." As Ms. Bisch testified, however, when she looked at the audit and its results, Plaintiff's failures were so egregious and the participant safety concerns so "glaring"—in combination with her belief that Plaintiff had not been forthcoming in her statements— that termination was the only option. (Bisch Dep. 58:21–59:7); see also Lassiter v. Children's Hosp. of Phila., 131 F. Supp. 3d 331, 348 (E.D. Pa. 2015) ("While [defendant's] decision to continually provide positive reviews to an underperforming employee may have been imprudent, the Court's role is not to determine whether the employer made the best or even a sound business decision but whether the real reason [for the adverse action] is discrimination.").

- Plaintiff argues, without citation, that Ms. Bisch did nothing to ensure that disciplinary actions are not motivated by race. Plaintiff does not explain what actions she should have taken.

- According to Plaintiff, Ms. Bisch stated on the Corrective Action Discipline Authorization that performance issues regarding Plaintiff were reported to her on December 27, 2021, but "she had no documentation to corroborate that date." (Pl.'s Opp'n Summ. J. 13.) Plaintiff, however, has no evidence to suggest that that date was incorrect.

- Plaintiff claims that Ms. Bisch did nothing to either provide Ms. Pope with all relevant data related to the investigation of Plaintiff's performance or to ensure that Ms. Dember was not singling out Plaintiff for discipline. Again, Plaintiff fails to identify what other "relevant data" should have been provided.

In short, Plaintiff's citation to immaterial facts does not meet her summary judgment burden to show that a reasonable jury could find that Defendant's stated reasons for termination were mere pretext for discrimination. Plaintiff admits that the audit of her cases revealed numerous serious failures on her part. (DSUF ¶¶ 40–43; PR ¶¶ 40–43.) Her subjective belief that the audit could have been conducted differently, that less harsh disciplinary action could have been taken, and that her prior performance reviews could have been considered are immaterial to the ultimate decision. As noted above, the question is not whether the employer is "wise, prudent, or competent," but rather whether discriminatory animus motivated the employer. Fuentes, 32 F.3d at 765. And Plaintiff's assertions do not demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered legitimate reasons for its action. Id. Plaintiff's speculation that race was a factor is premised on nothing but her own subjective belief. Jones, 198 F.3d at 414 (noting that an unsubstantiated belief of

discrimination is insufficient to meet a plaintiff's burden). As Plaintiff has not adduced any evidence from a reasonable factfinder could infer that considerations of race—as opposed to legitimate concerns about Plaintiff's performance—motivated Defendant's decision to terminate her, I will grant summary judgment on this claim.[2]

### B. Retaliation Claim Under § 1981

Plaintiff also claims that she suffered retaliation by Defendant. She contends that she engaged in protected activity by: (1) complaining to Ms. Bisch about Ms. Dember; and (2) by requesting that Mr. Mendez attend a February 2022 supervision meeting between her and Ms. Dember. Ten days after these actions, she was terminated. According to Plaintiff, "[t]hat 10-day period clearly establishes the required temporal proximity, is 'unduly suggestive,' and is sufficient standing alone to defeat summary judgment." (Pl.'s Opp'n Summ J. 15.)

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in activity protected by Title VII; (2) the employer took adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340 (3d Cir. 2006); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). At the *prima facie* stage, the plaintiff need only proffer evidence to show that his engagement in protected activity was the likely reason for the adverse employment action. Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 253 (3d Cir. 2017). If the employee establishes this *prima facie* case of retaliation, the familiar McDonnell Douglas approach applies in which "the burden shifts to

---

[2]     Although not raised as a separate cause of action, Plaintiff's Complaint cursorily alleges that she suffered damages as a result of a "racially hostile work environment." (Compl. ¶¶ 24–25.) To succeed on a hostile work environment claim based on race, the plaintiff must establish that (1) the employee suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).
       Defendant moves for summary judgment on this claim, arguing that the record is bereft of evidence that Plaintiff was subjected to severe or pervasive conduct. Plaintiff does not address this claim in her response brief. As I agree that Plaintiff has not shown severe or pervasive discrimination based on race, I will grant summary judgment on this claim as well.

the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir. 1997).

Plaintiff's retaliation claim fails on two grounds. First, Plaintiff has not shown that she engaged in protected conduct. For purposes of the first prong of a *prima facie* case of retaliation, protected "opposition" activity includes not only an employee's filing of formal charges of discrimination against an employer but also "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges." Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)). In determining whether a plaintiff adequately opposed discrimination, "we look to the message . . . conveyed [by a plaintiff's conduct] rather than the means of conveyance." Moore, 461 F.3d at 343 (quoting Curay–Cramer, 450 F.3d at 135). The opposition must be to discrimination based on a protected category, such as age or race. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015). Furthermore, in making the opposition, the plaintiff must have an "objectively reasonable belief" that the activity opposed constituted unlawful discrimination under the relevant statute. Id. at 193–94. Stated differently, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008).

Here, Plaintiff cites to her February 4, 2022 written statement as support for her protected activity. (Pl.'s Opp'n Summ. J. 15 (citing Pl.'s Ex. 31.) In this letter, Plaintiff accused Ms. Dember of abusing her power by requiring Plaintiff to attend supervision meetings for hours at a time, questioning her judgment, demeaning her competence, and sabotaging her. (Pl.'s Ex. 31.) She claimed that she was being unfairly targeted by Ms. Dember and given a purposeful lack of support. (Id.) Notably absent is any mention of

concerns about racial discrimination. Indeed, nothing in this letter conveys that Plaintiff was opposing unlawful discrimination based on race as opposed to simple aggressive behavior by her supervisor.

Moreover, even assuming Plaintiff had engaged in some protected conduct, she is unable to rebut Defendant's proffered reason for her termination.[3] As discussed above, the audit of Plaintiff's caseload began on January 14, 2022, well prior to Plaintiff's complaint. During the audit, Ms. Dember found that Plaintiff's cases had missing documentation, incomplete tasks, and care plans that had not been updated. (DSUF ¶ 32; PR ¶ 32.) Ms. Moore then completed the second part of the audit on January 26, 2022. (DSUF ¶ 35; PR ¶ 35.) Between January 31, 2022 and February 1, 2022, Ms. Dember and Ms. Moore performed an audit of several additional cases, bringing the total number of audited cases to twenty-six. Plaintiff conceded that the audits showed numerous instances of lack of contact with participants, failure to report participant concerns and follow up on critical incidents, and failure to complete documentation. (DSUF ¶¶ 40–41; PR ¶¶ 40–41.)  Although Plaintiff registered her complaint about Ms. Dember prior to being notified of these audit results and her suspension, the audit results themselves were obtained prior to Plaintiff's complaint. After Ms. Bisch and Ms. Pope met with Plaintiff on February 14, 2022, Ms. Bisch decided to terminate Plaintiff's employment. (DSUF ¶¶ 42–44; PR ¶¶ 42–44.) Plaintiff has not produced evidence from which a reasonable factfinder could determine that she was terminated in retaliation for her complaint about Ms. Dember.

## IV.    CONCLUSION

While Plaintiff has put forth evidence suggestive of a demanding work environment, such an environment does not equate to racial discrimination. Plaintiff admits that she was delinquent with a substantial number of work-related tasks and violated numerous rules that jeopardized patient safety.

---

[3]    Defendant also challenges whether Plaintiff has established a causal connection for purposes of her retaliation claim. As I grant summary judgment on this claim on other grounds, I need not address this argument.

Accordingly, I grant summary judgment in favor of Defendant and against Plaintiff. An appropriate Order follows.